

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EDWIN A. WILLIAMS, SR.,       )
                                      )
       **Plaintiff,**         )
                                      )     **No. 05 C 4917**
      v.                          )
                                      )     **Judge John W. Darrah**
PRESIDENTIAL PAVILION, LLC;   )
MICHAEL ROSEN, individually and in his capacity   )
as supervisor; and STEPHAN HILL, individually   )
and in his capacity as an employee and agent of   )
Presidential Pavilion, LLC,   )
                                      )
       **Defendants.**        )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Edwin A. Williams, Sr., filed a ten-count complaint against Defendants, Presidential Pavilion, LLC ("Presidential"), Michael Rosen, and Stephan Hill, alleging color and race discrimination, a hostile work environment, retaliation, defamation, and intentional infliction of emotional distress. Presently before the Court are Rosen's Motion for Summary Judgment[1] and Presidential's Motion for Summary Judgment.

### BACKGROUND[2]

Williams, an African-American, describes himself as a "fair-skinned black man." (Def.'s 56.1(a)(3) Statement ¶ 2). Presidential is a nursing home in Cook County, Illinois. (Id., ¶ 3). Williams began his employment in the Maintenance Department of Presidential on

---

[1]Rosen moves for summary judgment on Counts V and VI of the Second Amended Complaint. Williams does not oppose the entry of summary judgment on these counts.

[2]Defendant previously moved to strike portions of Plaintiff's responses to Defendants' Rule 56.1(a)(3) statements, portions of Plaintiff's affidavit, and paragraph 18 of Plaintiff's statement of additional facts. Defendant's motion was denied; however, Defendant's objections were considered in determining the Rule 56.1 statements of undisputed facts.

September 3, 2003. Williams' job responsibilities included painting, performing electrical work, and general maintenance tasks. Williams was hired by and reported to the Maintenance Supervisor, William Ethridge, an African-American. Ethridge, in turn, reported to the Administrator, Michael Rosen, a Caucasian. (Id., ¶ 6). Williams describes Ethridge as "dark-skinned." Ethridge was aware of Williams' skin color at the time that Ethridge hired Williams. Williams had a good relationship with Ethridge, and Ethridge treated Williams well at work. Williams considered Ethridge a friend while he worked at Presidential, and he and Ethridge socialized outside of work. (Id., ¶ 7).

Prior to beginning his work at Presidential, Williams completed and signed an employment application. The employment application stated, in pertinent part, "I understand that my employment is at will, and that either party is free to terminate the employment relationship at any time without cause." Although the majority of Presidential employees were union-represented and covered by a collective bargaining agreement, Williams and the other Maintenance Department employees were not in a union. To Williams' knowledge, he did not have any type of employment agreement that limited the circumstances under which Presidential could terminate his employment. (Def.'s 56.1(a)(3) Statement ¶ 8).

On his first day of work, Williams received, and signed, a copy of Presidential's "Harassment Policy." The Harassment Policy was in effect throughout Williams' tenure, applied to all employees, and was posted near the employee time clock. The policy included a statement of Presidential's commitment to providing a workplace free from discrimination and harassment based on race, color or any other basis protected by federal, state or local laws; a provision for disciplinary action, up to and including termination of an employee who engages in misconduct prohibited by

2

the policy; a non-retaliation statement; and a procedure for internally reporting alleged discrimination, harassment, and retaliation. (Def.'s 56.1(a)(3) Statement ¶ 9). Williams also received a copy of Presidential's personnel policies. The policies included a list of conduct that could result in a written warning, suspension or discharge from employment, including "conduct unbecoming to your position," and a list of conduct that would subject an employee to immediate termination of employment, including "[v]erbal or physical abuse of any fellow employee." (Id., ¶ 10).

Throughout Williams' employment, Presidential had a set of "Work and Safety Rules and Regulations" ("Union Rules"). The Union Rules were an addendum to the collective bargaining agreement that covered Presidential's union-represented employees. The Union Rules were used as a framework for disciplining and discharging non-union employees but were not required to be followed for non-union employees. Ethridge testified that Presidential tried to use the Union Rules for all employees, including Williams; but they were used only as a guide for fairness. (Def.'s 56.1(a)(3) Statement ¶ 11; Plaint.'s Response ¶ 11). Williams asked for, and received, a copy of the Union Rules in April or May 2005. (Id., ¶ 12). The Union Rules provide that an employee should be subject to an informal warning for the first offense of performing work in an unsafe manner. The second offense subjects an employee to a formal warning. The third offense subjects an employee to up to three consecutive days of suspension. A fourth offense may result in termination. (Plaint.'s 56.1(b)(3) Statement ¶ 9).

Throughout Williams' employment, Presidential also had a set of "Safety Rules and Regulations for All Employees" ("Safety Rules"). The Safety Rules included the following provision: "Any housekeeper mopping the floor must used [sic] wet floor signs! Employees that see

3

wet floor signs must not enter that area." (Def.'s 56.1(a)(3) Statement ¶ 13). Williams was aware that Presidential employees could be disciplined or discharged for engaging in unsafe work practices. Williams testified that walking across a waxed or wet floor would present a risk of slipping and falling. Williams also understood that an employee was subject to immediate discharge if the employee struck and injured another employee at work. (Id., ¶ 14).

During Williams' employment, Stephan Hill, an African-American, held a non-supervisory position in the Housekeeping Department. Hill was primarily responsible for floor care, including mopping and waxing. Hill reported to Joyce Griffin, an African-American, the Housekeeping Supervisor. Griffin was responsible for supervising the operations and employees in the Housekeeping and Laundry Departments. Griffin reported directly to Rosen. Neither Griffin nor Hill had any supervisory authority over Williams. (Def.'s 56.1(a)(3) Statement ¶ 15). Griffin and Hill are husband and wife. Williams describes Hill's skin color as "a little darker" than his own and describes Griffin's skin color as "maybe my complexion, maybe a little lighter." (Id., ¶ 16).

On May 5, 2005, Rosen learned of an incident involving Hill and Williams while Hill was stripping and waxing a floor in one of Presidential's dining rooms. Based on the information reported to Rosen, it was his understanding that the residents had been cleared from the area where Hill was working and that Hill had set up the required "wet floor" signs. Williams entered the area that Hill was working, and Hill told Williams that he was waxing the floor, that it was still wet, and asked Williams not to walk on the floor. Williams proceeded to walk on the floor, telling Hill, "Fuck you and the floor." (Def.'s 56.1(a)(3) Statement ¶ 17). As to the incident, Williams testified that the residents had been cleared of the area that was being waxed and that when he opened the door to the dining room, he saw that the floor was wet. After stepping on the wet floor, Hill asked,

4

"What are you doing? You see me doing this work" or "What are you doing? I'm waxing the floor." Williams then saw the "wet floor" sign but continued to walk on the floor. Williams had an option to walking across the wet floor, and he understood that Hill was upset with him for walking across the wet floor. (Id., ¶ 18; Plaint.'s Response ¶ 18).

Based on the information Rosen received regarding Williams' behavior, Rosen issued a three-day suspension to Williams because: (1) Williams engaged in an unsafe practice that violated Presidential's safety policies, (2) Williams' actions exposed Williams to a risk of personal injury by falling on a wet floor and had exposed Presidential to potential liability in a workers' compensation claim, (3) Williams acted in a provocative manner toward Hill, and (4) Williams' words and actions demonstrated a lack of understanding of the severity of the issue. (Def.'s 56.1(a)(3) Statement ¶ 19). The suspension notice Rosen prepared stated: "Employee created a hostile & unsafe environment by walking on a wet waxed floor in order to dirty up floor. This employee intended to send message to the other employee of hostile nature and also did not follow safe workplace rules. Employee is suspended for three days. Next infraction will be termination." (Id., ¶ 20). Williams was informed of his suspension during a meeting with Ethridge the same day the incident took place. Williams served the three-day suspension, without pay, as a result of the incident. (Id., ¶ 21).

At approximately 8:30 a.m. on June 29, 2005, Denise Smith, a Presidential Rehabilitation Nurse/Nurse Supervisor, telephoned Rosen and informed him that there was an incident between Williams and Hill. Smith stated that Williams had hit Hill, Hill was bleeding, and Hill had been taken to Holy Cross Hospital. (Def.'s 56.1(a)(3) Statement ¶¶ 22, 25).

Smith, an African-American, reported to Ophelia Guillermo, who reported to Rosen. Williams described Smith's skin color as "maybe the same complexion, a little darker" than

Williams' skin color. (Def.'s 56.1(a)(3) Statement ¶¶ 22-23). Williams interacted with Smith at least once a day while he worked at Presidential. According to Williams, Smith was "nice," never mistreated Williams at work, and Williams and Smith were "work friends." Williams did not believe that Smith was out to get him or that she would make things up to get him in trouble or get him fired. (Id., ¶ 24). Smith also reported the incident to Ethridge, Guillermo, and Rosie Glave, a Nursing Supervisor. (Id., ¶ 26).

After speaking with Smith, Rosen went to Holy Cross Hospital, where he met and spoke with Hill. Hill was in a bed in the emergency room, his head was bandaged, and he was complaining about pain in his head. Hill told Rosen that Williams had hit him in the head when he was going into the Housekeeping office and that Williams made a statement before hitting him. (Def.'s 56.1(a)(3) Statement ¶ 27).

After returning to Presidential, Rosen met with Smith. Smith told Rosen that she was sitting in her office with the door open. She saw Williams walking toward the Housekeeping office and heard Williams say, "I'm tired of your shit," and move in a forward motion to hit Hill from behind. She heard two noises and then ran out of her office. She found Hill on the ground and looked around and saw Williams. Smith observed Hill was bleeding and that he appeared to be unconscious. Smith did not see Williams strike Hill, but she saw Williams' body move in a forward lunge toward Hill; and then she immediately heard the two sounds – one sound was a bang and then a thump to the floor. Smith called for help and proceeded to provide medical care to Hill. Smith observed Williams head toward the stairs. (Def.'s 56.1(a)(3) Statement ¶ 28; Plaint.'s Response ¶ 28). That same day, Rosen completed a "Supervisor's Report of Work Injury or Illness," in which Rosen

6

summarized his conversations with Smith and Hill. The report noted that Smith and Hill both told Rosen that Williams hit Hill. (Id., ¶ 30).

Williams denies that he hit Hill. According to Williams, Hill called him on the telephone shortly after 8:00 a.m. on June 29, 2005, and called Williams a "ho ass nigger." Williams immediately left the maintenance office "to go talk to [Hill] to see what the problem was." Williams intended to "confront" Hill about what he allegedly had said to Williams. (Def.'s 56.1(a)(3) Statement ¶ 31). According to Williams, Williams saw Hill coming out of an office; and he approached him, stating, "So what's going on? Why is you calling me out my name, cursing at me?" Williams might also have stated, "I'm tired of this shit." Hill did not respond to Williams, but the two met in front of the Housekeeping office and "got face to face." Williams believes that Smith was in the office with the door open. When Smith came out of the office, Hill was laying on his back, unconscious; and blood was coming out of the back his head. (Id., ¶ 32). According to Williams, Hill tried to punch Williams in the face but missed. Hill then fell to the ground and hit his head on the floor. (Plaint.'s 561.(b)(3) Statement ¶ 20).

Based on the information Rosen received regarding the incident, Rosen concluded that Williams had hit and injured Hill. Rosen decided to terminate Williams for "fighting." Rosen did not terminate Hill because he had no information that Hill had participated in the fight. (Def.'s 56.1(a)(3) Statement ¶ 33). Rosen based his conclusion, that Williams had hit and injured Hill, on several factors, including: (1) Hill and Smith both reported, based on their personal observations, that Williams had hit Hill; (2) Smith's and Hill's versions of the incident were the same; (3) Rosen believed that Hill's and Smith's reports were clear and trustworthy; (4) Rosen believed that the nature and location of Hill's injury was consistent with Hill's and Smith's report; and (5) Rosen had

no reason to disbelieve Hill's and Smith's reports, particularly Smith's report because she was a long-time and unbiased supervisory employee who had no reason to fabricate a claim against Williams. (Id., ¶ 34). Williams' termination notice, which was prepared by Rosen and signed by Ethridge, stated, "Employee Edwin Williams was fighting with Stephan Hill. This is breaking facility policy of none [sic] fighting and causing harm to another employee." The termination notice was kept in Williams' personnel file and was submitted to the unemployment compensation office in connection with Williams' claim for unemployment benefits. (Id., ¶ 36). Williams believes that he was informed of his termination through a telephone call from Ethridge the evening of June 29, 2005. Ethridge told Williams he was fired because Hill had stated that Williams hit him. (Id., ¶ 35).

Williams was replaced by James Nathan, who was hired for the vacant maintenance position, on August 11, 2005. Nathan is African-American and has the same skin color as Williams. (Def.'s 56.1(a)(3) Statement ¶ 37).

While at the hospital on June 29, 2005, Hill filed a complaint with the Chicago Police Department. Hill told the police that Williams had hit him in the head with a pipe. No one from Presidential instructed Hill to complete a police report. (Def.'s 56.1(a)(3) Statement ¶ 38). The complaint led to a criminal charge and trial against Williams. At the criminal trial, Hill testified that Williams hit him in the head with a metal pipe. Other than Hill, no other Presidential employee testified at the criminal trial. (Id., ¶ 39). Rosen did not complete any police reports, on his own or on Presidential's behalf, against Williams regarding the June 29, 2005 incident. (Id., ¶ 40). Williams was found not guilty of battery. (Plaint.'s 56.1(b)(3) Statement ¶ 34).

On July 19, 2005, Hill completed a report regarding the June 29, 2005 incident and gave the report to Martha Lara, Presidential's Personnel Manager. In the report, Hill stated, "Edwin ran up

behind me and hit me with a pipe in the back of the head." Hill believed that he needed to fill out the report to insure that he was paid for the time he was off of work because of the incident. Hill understood that the report was going to be used to process his workers' compensation claim against Presidential. (Def.'s 56.1(a)(3) Statement ¶ 41). In connection with his workers' compensation claim, Hill underwent an independent psychiatric examination at Presidential's workers' compensation carrier's request. During the related interview, Hill stated that Williams had hit him in the head with a metal pipe. (Id., ¶ 42).

Williams claims that Rosen failed to talk with him or give him the opportunity to present his version of the events before suspending and terminating his employment. Unlike Williams, Rosen gave other Presidential employees the opportunity that he was denied. (Def.'s 56.1(a)(3) Statement ¶ 44). For example, Williams claims that at the end of 2004 or early 2005, a nurse named Joanne accused two Certified Nursing Assistants ("CNA") of threatening her outside of working hours and off Presidential property. According to Williams, the nurse was Filipino and the two CNAs were African-American. One of the CNAs was about Williams' skin color, and the other was light-skinned. Both of the CNAs were union workers. When Rosen learned of the accusation, Rosen called the three employees into his office and spoke with them – none of the employees were suspended. (Id., ¶ 44). Also in 2005, Jackie Campbell, an Activity Supervisor, accused two activity aides – Tequila Ousley and Tunesha Hogan – of writing a threatening letter. Campbell is African-American with a skin color that is " a lot lighter" than Williams' skin color. Ousley is African-American with medium-colored skin. Hogan is an African-American with skin coloring that is " a

little lighter" than Williams. Ousley and Hogan are both union workers. After Rosen learned of the accusation, Rosen spoke with the three employees; and Ousley and Hogan received verbal warnings. (Id., ¶ 46).

Williams claims that in early 2005, Rosen spoke with Guillermo and an African-American medical records employee, Chevelle, after they allegedly had an argument at the front desk. Chevelle received a three-day suspension from this incident. (Def.'s 56.1(a)(3) Statement ¶ 47). As to another employee, Rosen learned that a Caucasian, union-represented employee named George was drinking on the job. Rosen tried to have the employee fired but, Williams "guess[es] the union wouldn't allow it." Rosen did suspend George for three days and told him to attend Alcoholics Anonymous. The next day, George was fired when he came to work intoxicated. (Id., ¶ 48).

Williams also claims that other employees engaged in fighting at work. In 2003, Reggie, a union-represented African-American with skin color darker than Williams and Hill, had a fight with Hill. Williams heard that Rosen wanted to fire Reggie, but Reggie's supervisor resisted. Neither employee was fired. (Def.'s 56.1(a)(3) Statement ¶ 49). Charlene Tatum, an African-American Presidential employee, witnessed the fight between Reggie and Hill. Tatum described the fight as "tussling with each other. Like they were holding each other." Tatum did not see either person attempt to punch the other and could not recall if either of them were bruised or bleeding. Neither Reggie nor Hill were injured, taken to the hospital; and no police report was filed regarding the incident. (Id., ¶ 50).

In early 2005, Marilyn, a Filipino medical records employee, had a fight with Cynthia, a non-Presidential employee who sold jewelry to Presidential employees. Williams heard that Marilyn and Cynthia got into a verbal dispute over money that Marilyn allegedly owed Cynthia. Marilyn received

a "black eye and stuff." (Def.'s 56.1(a)(3) Statement ¶ 52). Rosen was aware of the incident; but, to his knowledge, Marilyn did not engage in any aggressive behavior. It was his understanding that Cynthia made an accusation against Marilyn and then struck Marilyn. (Id., ¶ 53).

Williams claims Beverly, a receptionist, "got into a scuffle" with Tequila Ousley. Beverly and Ousley are both African-American. Beverly's skin color is "maybe a little darker" than Williams, and Ousley was "fair skinned." Williams heard that Ousley pushed Beverly, who started crying and went to report the incident to Rosen. Rosen did not take any disciplinary measures against either Beverly or Ousley. It was Williams' understanding that at the time of the incident, Ousley was on record with complaints about alleged sexual harassment at Presidential and that Rosen was aware of her complaints. (Def.'s 56.1(a)(3) Statement ¶ 54). Williams also claims that in 2005, Anthony Thomas, an African-American with the same skin color as Williams, had a fight with an unnamed housekeeper. Williams was told by Thomas that the housekeeper jumped on Thomas's back, and then Thomas threw the housekeeper to the ground and beat him up. No disciplinary action was taken against the housekeeper. (Id., ¶ 55).

Williams described his relationship with Hill, both before and after his suspension, as a "Hi and bye relationship." The two never "sat down and talked;" they "just spoke to each other and kept walking." (Def.'s 56.1(a)(3) Statement ¶ 56). In 2003, Williams walked on a wet floor that Hill was working on; and Hill called him an "ignorant mother fucker." Williams responded, "Who do you think you're talking to?" and Hill "started yelling." (Id., ¶ 57). A couple of weeks before Williams' suspension, Hill asked to borrow some money from Williams. This was the third or fourth time that Hill had asked Williams for money. Williams told Hill, "Man, I don't got no money. Quit asking me for money." Nothing else was said, and Hill "looked at [Williams] funny and walked

11

away." Hill also asked other employees for money. (Id., ¶ 58). On one occasion, Hill called Williams an "ignorant mother fucker" in Rosen's presence. Rosen did not admonish Hill, only stating later to Williams, "Somebody was a little upset this morning, huh?" (Plaint.'s 56.1(b)(3) Statement ¶ 15).

Following his suspension, Williams sometimes went into the Maintenance office and found Hill in the office with other maintenance employees, including Ethridge. Hill would be sitting in Williams' chair, leaning back with his feet on Williams' desk, smoking a cigarette. Williams did not like Hill in the office but did not say anything. Williams did not know if Hill's presence and actions were motivated by Williams' race or color. (Def.'s 56.1(a)(3) Statement ¶ 59). In another post-suspension incident, Williams was helping a woman fix a flat tire during his lunch period. After Williams left the area to get a wrench, he returned and saw Hill "messing with [the] car." Williams did not ask Hill what he was doing; and when the woman stated that Williams was helping her, Hill walked away. (Id., ¶ 60).

Williams testified that he has referred to another African-American as a "ho ass nigger" or similar "profane" comment using the word "nigger" in a heated argument or similar situation. When he used the comments, Williams was not discriminating against the person because of their race but was trying to provoke them or hurt their feelings. (Def.'s 56.1(a)(3) Statement ¶ 62).

Williams also had "incidents" with Housekeeping Supervisor Griffin. (Def.'s 56.1(a)(3) Statement ¶ 63). For a period of about a week after Williams started working at Presidential, Griffin would follow Williams around and "yell out [his] name and stuff like that." Williams did not know why Griffin did this, but it was "annoying" to Williams. (Id., ¶ 64). Three or four other times, Griffin would blame Williams or someone else from the Maintenance Department when the state

12

surveyors would "tag" Griffin's Housekeeping Department. Williams did not know why Griffin did this, but it bothered Williams and other Maintenance Department employees. (Id., ¶ 65). On five or less occasions, Griffin would "probably purposely make work for [him], something like that." For example, one time the state regulators told Housekeeping to clean the walls in the bathrooms of the residents' rooms. Instead of cleaning the walls, Griffin tried to make Williams paint the bathroom walls. According to Williams, Griffin was not a "working supervisor"; and she "would want somebody else to do it." Griffin engaged in the same behavior toward her Housekeeping staff. (Id., ¶ 67). In one other incident in-between Williams' suspension and his termination, Griffin entered an elevator that Williams was using; and Williams told her there was no room and that she would have to wait. Griffin stated she was not going to wait, and Williams had to take her to her floor before he could continue his work. (Id., ¶ 67). Griffin never made any comments related to Williams' race or color. (Id., ¶ 69).

In March or April 2005, Williams told Rosen, "I have a problem with Joyce [Griffin] and Stephan [Hill], you know, bothering me." (Def.'s 56.1(a)(3) Statement ¶ 70). Williams did not express to Rosen that he thought employment decisions that Rosen made were relevant to Williams or were motivated by Williams' race or color. (Id., ¶ 71). Williams never reported to anyone at Presidential that Hill called him a "ho ass nigger." (Id., ¶ 72).

Williams believes that he either complained to Ethridge or Ethridge observed the above "incidents" with Hill and Griffin. However, when he spoke with Ethridge, he did not tell Ethridge that he thought Hill or Griffin were doing those things to him because of his race or color. (Def.'s 56.1(a)(3) Statement ¶ 73). Shortly after his suspension, Williams told Ethridge that he did not appreciate the way Rosen treated him in connection with the suspension and that he "believe[d] it

was because of [his] color." Williams does not know if Ethridge shared this with Rosen. (Id., ¶ 74). Ethridge denies Williams made any comments or complaints about alleged race or color discrimination, or any other unlawful conduct by anyone at Presidential. Ethridge denies that he observed any of the "incidents" with Hill and/or Griffin. Ethridge did not speak to Rosen about Williams' complaining that he believed he was suspended because of his color. (Id., ¶ 75). Rosen has no knowledge of Williams' ever reporting, complaining about, or opposing any alleged race or color discrimination or any unlawful conduct by Hill and/or Griffin. (Id., ¶ 76).

At the time of Williams' termination, Presidential employed a total of two hundred seventy-one employees. Two hundred fifty-two of these employees, ninety-three percent, were African-American. Williams was one of four Maintenance Department employees. Three of the four employees, including Williams and his supervisor, Ethridge, were African-American. (Def.'s 56.1(a)(3) ¶ 77).

Rosen testified that he has no knowledge of any other employee who walked across a wet or waxed floor, especially in such an intentional and hostile manner in which Williams acted. Rosen has suspended other Presidential employees that he believed engaged in conduct that warranted such discipline. In November 2002, Rosen suspended Hill for three days for selling two cans of spray deodorant to a co-worker during working hours. (Def.'s 56.1(a)(3) Statement ¶ 80). Rosen also testified that he has no knowledge of any Presidential employee who intentionally struck and injured a co-worker, other than Williams. Rosen has terminated other employees whom he believed had engaged in fights at work or engaged in other serious workplace misconduct warranting termination. (Id., ¶ 81).

14

Neither Rosen or Ethridge perceived Williams as a light-skinned or fair-skinned African-American. They did not draw distinctions between Williams and other African-American employees based on their skin color and did not observe any discernable difference between Williams' and Hill's skin color. (Def.'s 56.1(a)(3) Statement ¶ 82). Tatum, an African-American co-worker, testified that Williams and Hill were about the same color. Tina Townsend, another African-American co-worker, who knew Williams very well, testified that she would not describe Williams as "light-skinned" and that Williams and Hill were "round the same skin complexion, brown-skinned." (Id., ¶ 83).

Williams did not know or could not really say if he believed Presidential discriminated against him because of his race or color and/or if Presidential retaliated against him because of any complaints about what he believed to be unlawful treatment to which he had been subjected. (Def.'s 56.1(a)(3) Statement ¶ 86).

Griffin told Smith and Tatum that Williams hit Hill in the head with a pipe. Griffin also told Guillermo that Williams "beat up my baby." Griffin told Townsend that Williams knew "he is wrong for hitting Stephan [Hill]." (Def.'s 56.1(a)(3) Statement ¶ 91).

On October 4, 2005, Rosen completed a performance evaluation of Williams that included negative performance remarks. The top right-hand corner of the document was dated "10-4-04." Rosen described the document as an "internal memo" regarding Williams' work history and that the 2004 date referenced Williams' approximate start date. Rosen remembered filling out similar forms for other employees after their termination but could not recall any specific employee. (Plaint.'s 56.1(b)(3) Statement ¶ 26; Def.'s Response ¶ 26).

15

# ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

## Race and Color Discrimination Claims[3]

Williams may prevail on his race and color discrimination claims either through the "direct method" – showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*). Williams does not present direct evidence of discrimination and concedes that he must proceed under the *McDonnell Douglas* rubric.

---

[3]Williams' discrimination, hostile work environment, and retaliation claims are brought pursuant to Title VII and 42 U.S.C. § 1981. The applicable standard for each claim under either statute is the same. Accordingly, the analysis for each of these claims is determinative under both Title VII and Section 1981. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).

To establish a *prima facie* case of race and/or color discrimination under the *McDonnell Douglas* framework, Williams is required to demonstrate that: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001). If Williams demonstrates a *prima facie* case, the burden shifts to Presidential to demonstrate "a legitimate, nondiscriminatory reason for the action." *Blise*, 409 F.3d at 867. If Presidential meets this burden, the burden shifts back to Williams to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

Williams is a member of a protected class and suffered an adverse employment action – a three-day suspension and termination of employment. As to the second and fourth prongs of the test, Williams essentially bases his claim on his assertion that he was disciplined in a manner different than other employees; then, the second and fourth prongs of the *McDonnell Douglas* test merge. *See Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002); *Curry v. Menard, Inc.*, 270 F.3d 473, 479 (7th Cir. 2001); *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999).

A plaintiff demonstrates that another employee is "similarly situated" to him by "show[ing] that there is someone who is directly comparable to [him] in all material aspects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A court must look at all relevant factors, the number of which depends on the specific case, when making this determination. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (*Radue*). In disciplinary cases in which the plaintiff alleges that he was disciplined more harshly than a similarly situated employee, the

plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. *See Radue*, 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18.

As to Williams' suspension for walking on the wet floor, Williams has failed to present a similarly situated employee that engaged in similar conduct that was less harshly disciplined. As to Williams' termination, William argues that a Filipino employee, Marilyn, had a fight with a vendor named Cynthia and was not disciplined. However, Marilyn is not a similarly situated employee. Contrary to Williams' fight with Hill, Marilyn did not fight with another Presidential employee, nor was anyone seriously injured and hospitalized. Moreover, Marilyn's supervisor believed that Marilyn had not initiated the fight, nor was she an active participant in the fight.

Williams also argues that Hill and Reggie are similarly situated employees who engaged in a fight but were not disciplined.[4] However, these employees were not similarly situated in all respects in that incident. Both Reggie and Hill reported to a different supervisor than Williams; Reggie was a union-represented employee; Rosen wanted to terminate Reggie's employment, but his supervisor disagreed; and the altercation involving Reggie and Hill did not involve serious injury or hospitalization. *See Spath v. Hayes Wheels International-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (plaintiff and co-worker not similarly situated because plaintiff's conduct of lying about the circumstances surrounding accident until termination meeting was more serious than co-worker's

---

[4]This argument would only apply to Williams' color discrimination claim because Hill, Reggie, and Williams are all African-Americans.

18

conduct who rescinded his false statement about the incident sooner). Accordingly, Williams has failed to show that other similarly situated employees not in the protected class were treated more favorably; and he has failed to establish a *prima facie* case of discrimination.

Assuming argumendo, that Williams had presented a *prima facie* case, he has failed to demonstrate that Presidential's proffered reasons for suspending him and terminating his employment were a pretext to discrimination.

Presidential asserts that it suspended Williams for walking on the wet floor in violation of company policy and terminated Williams' employment because he fought and injured Hill. To demonstrate pretext, a plaintiff must show that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995).

Williams asserts that evidence of pretext include: (1) Presidential did not follow its disciplinary policy when it suspended him; (2) Rosen completed an evaluation form two months after Williams was terminated; and (3) Rosen's investigation into the fight with Hill was unreasonable.

Williams asserts that Presidential failed to follow the disciplinary procedures set out in the Union Rules. Williams concedes he was not represented by a union but cites Ethridge's deposition testimony that the Union Rules were in effect at the time of Williams' employment and applied to Williams as a non-union employee. However, Williams failed to include Ethridge's entire testimony on the subject of the application of the Union Rules to non-union employees. Ethridge explained in his deposition, that while the Union Rules could be used for non-union employees, they

19

were only used as a guide. Furthermore, Ethridge was free to use his discretion in determining what disciplinary action was required. Moreover, Rosen, who was involved in disciplining Williams and was the person responsible for Williams' termination, did not believe that the Union Rules applied to non-union workers such as Williams. *See Kohl v. Beverly Enter. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001) (rejecting plaintiff's argument that employer's failure to follow written discipline policies showed pretext); *Kipnis v. Baram*, 949 F. Supp. 618, 623 (N.D. Ill. 1996) (evidence that employer may not have followed complaint procedure did not support plaintiff's discrimination claim absent evidence that employer's departure from procedure was motivated by discriminatory animus). In addition, Presidential's personnel policies specifically provided that an employee could be immediately terminated for physical abuse of another employee; and Williams acknowledged that immediate termination was possible for fighting.

Williams also asserts Rosen's internal memo of October 4, 2005, two months after Williams' termination, which included negative performance comments, is evidence of pretext because it shows that Presidential was "trying to drum up a reason for firing" him. However, Rosen testified that his reason for completing the memo was to summarize Williams' work and that he had completed the same type of memo for other employees. Furthermore, Presidential does not contend that Williams was terminated because of poor performance; and the termination notice does not include poor performance as a reason for his termination. Instead, Williams was terminated for the incident with Hill.

Lastly, Williams asserts that Rosen's investigation into the fight with Hill was unreasonable because Rosen failed to interview Williams and he only interviewed two other people, Hill and Smith. Williams takes issue with Rosen's termination decision, based on his belief that Williams

20

struck Hill, after interviewing Hill and Smith and not interviewing Williams. However, the court will not second guess an employer's decision, regardless of whether it is correct in its belief, if an employer acted in good faith and with honest belief. *See Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997). The undisputed facts demonstrate that Rosen investigated the incident, first speaking with Hill and then Smith. Smith's version of the incident mirrored that of Hill's version. Smith was an unbiased, independent witness who believed, based on what she observed, that Williams struck Hill and that Hill was severely injured. While Williams contends that Rosen's decision was wrong, Williams must provide more than his unsupported pronouncement that Presidential was mistaken. *See Green v. National Steel Corp.*, 197 F.3d 894, 898-99 (7th Cir. 1999) (plaintiff must provide more than her statement that defendant was mistaken). Based on the above, Williams has failed to show that Presidential's proffered reasons for Williams' suspension and termination were a pretext to discrimination.

Based on the above, summary judgment is granted in Presidential's favor on Williams' race and color discrimination claims.

### Hostile Work Environment Claims

To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate: (1) the workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment; (2) the harassment was based on plaintiff's color; (3) the plaintiff perceived the work environment to be hostile or abusive; (4) a reasonable person would have perceived the work environment to be hostile or abusive; and (5) the employer knew or reasonably

21

should have known that the plaintiff was being subjected to such treatment, and it did not take appropriate corrective action. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (7th Cir.1999).

Whether a work environment is sufficiently hostile or abusive is judged by looking at all of the circumstances, including: the severity of the conduct, the frequency of the conduct, whether it is humiliating or physically threatening or a mere offensive utterance, and whether it unreasonably interferes with a person's work performance. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-72 (2001) (*Breeden*). Offhand comments, simple teasing, and isolated incidents (unless extremely serious) do not amount to a hostile or abusive work environment. *Breeden*, 532 U.S. at 271.

In his deposition, Williams testified that Hill sometimes asked Williams for money and a few times was in Williams' chair, leaning back with his feet on Williams' desk, smoking a cigarette. Williams also testified that Hill once called him an "ignorant mother fucker" and, on the day of the incident, called him a "ho ass nigger." Williams has failed to demonstrate that these isolated occurrences, which occurred over a several-month period, were sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive working environment. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (ten offensive comments, only four of which were sexual in nature, over several months were insufficient to make work environment objectively offensive).

22

Williams argues that using the racial epithet "nigger" even once is sufficient to create a hostile work environment. In support of his argument, Williams cites to *Tutman v. WBBM-TV/CBS, Inc.*, 54 F. Supp. 2d 817 (N.D. Ill. 1999) (*Tutman*) and *Rogers v. Western-Southern Life Ins. Co.*, 12 F.3d 668 (7th Cir. 1993) (*Rogers*). However, both cases are readily distinguished from the instant case.

In *Tutman*, the district court denied summary judgment on the plaintiff's hostile work environment claim that included a single incident involving the use of the term "nigger" and also included a threat to kill the African-American plaintiff. The *Tutman* court specifically noted that the case was distinguishable from other cases that involved a single incident of an offensive epithet because of the added threat to the plaintiff's life. *See Tutman*, 54 F. Supp. 2d at 825. The *Rogers* court noted the "single act" of using the term "'nigger' by a supervisor in the presence of his subordinates" can create a hostile work environment. *Rogers*, 12 F.3d at 675. However, unlike the instant case, it was the *Rogers'* Caucasian supervisor who used the racial epithet and did so five to ten times. *See Rogers*, 12 F.3d at 671, 675. Here, Williams' African-American co-worker used the epithet once without any threat to Williams. The one-time use of the epithet by Williams' African-American co-worker, coupled with the infrequent simple teasing and isolated incidents, did not create an objectively hostile work environment. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (use of the epithet "nigger" on one occasion by a Caucasian co-worker insufficient to demonstrate severe or pervasive action creating a hostile work environment); *Sanders v. Village of Dixmoor*, 178 F.3d 869, 870 (7th Cir. 1999) ( use of the epithet "nigger" on one occasion during an altercation not sufficiently severe or pervasive to create an objectively hostile work environment).

23

Based on the above, summary judgment is granted in Presidential's favor on Williams' hostile work environment claims.

<em>Retaliation Claims</em>

An employee may present either direct or indirect evidence of retaliation. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007) (*Humphries*). Under the direct method, a plaintiff must show: (1) that he engaged in a statutorily protected activity, (2) he was subjected to an adverse employment action, and (3) there is a causal connection between the two events. *See Humphries*, 474 F.3d at 404. Under the indirect method, a *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite meeting his employer's legitimate job expectations, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. Once the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Tomanovich v. City of Indianapolis*, 457 F.3d 657, 663 (7th Cir. 2006) (*Tomanovich*).

Williams proceeds under the direct method of proof. Williams argues that a genuine issue of material fact exists whether there is a causal connection between his termination and his complaint to Ethridge that he felt discriminated against based on: (1) the timing of his termination, (2) his strong job performance, and (3) the evidence suggesting his termination was pretextual.

Temporal proximately, alone, is generally insufficient to demonstrate a causal connection. *See Tomanovich*, 457 F.3d at 665. Williams' "strong job performance" also fails to demonstrate a causal connection. Less than two months prior to his termination, Williams was suspended and warned that an additional infraction could lead to termination. Furthermore, Williams was not terminated because of poor performance but for fighting and injuring a co-worker. Lastly, as discussed above, Williams has failed to demonstrate Presidential's stated reason for his termination was pretextual. Accordingly, Williams has failed to demonstrate a genuine issue of material fact exists as to whether a causal connection exists between his complaint of discrimination and his termination.

In his response brief, Williams does not argue that he has demonstrated a retaliation claim under the indirect method of proof. For the same reasons Williams cannot demonstrate his race and color discrimination claims under the indirect method of proof discussed above, Williams cannot demonstrate a retaliation claim under the indirect method of proof.

Based on the above, summary judgment is granted in Presidential's favor on Williams' retaliation claims.

Williams' remaining claims are state-law claims of defamation and intentional infliction of emotional distress. Based on the above, Williams no longer has a valid federal claim before the Court. In the absence of a valid federal claim, Williams' remaining state-law claims are dismissed without prejudice for lack of pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715 (1966); *Mandarino v. Pollard*, 718 F.2d 845, 850 (7th Cir. 1983).

## CONCLUSION

For the reasons stated above, Rosen's Motion for Summary Judgment is granted on Counts V and VI of Williams' Second Amended Complaint. Presidential's Motion for Summary Judgment is granted as to Williams' discrimination, hostile work environment, and retaliation claims.    Williams' remaining state-law claims are dismissed without prejudice for lack of pendent jurisdiction.

Dated:  6-14-07

JOHN W. DARRAH
United States District Court Judge